782 F.2d 1044
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellant,
v.
SAMUEL L. AMBROSE; MARTHA M. AMBROSE; MARY SELAK; HAROLD
WILLIAMS, Treasurer, Trumbull County, Ohio,
Defendants-Appellees,Cross-Appellants.
 84-3965, 84-3984
 United States Court of Appeals, Sixth Circuit.
 12/16/85
 
 Before: LIVELY, Chief Judge; WELLFORD, Circuit Judge; and, BROWN, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 Defendant Samuel L. Ambrose owes the government back taxes for the years 1970, 1971, and 1972.[1] The government sought to collect these back taxes by foreclosing upon two pieces of real estate located at 1007 North Ward Avenue and another at 725 Esme Drive in Girard, Ohio. The district court enforced the government's action against the Esme property but rejected its request for judgment regarding the Ward property.
 
 
 2
 During the past fifteen years, these two properties have been formally conveyed to relatives of Samuel Ambrose and his wife. The government contends that these conveyances were sham transactions, without economic substance, and conducted by Samuel and Martha Ambrose to avoid the aforesaid tax liabilities. Accordingly the government petitioned that the court set aside these conveyances and determine sufficient title in the properties to Samuel Ambrose and thus subject to levy and sale for the benefit of the government to satisfy the long-standing tax liability.
 
 
 3
 Samuel L. Ambrose, the principal defendant, is a Youngstown-Warren, Ohio, native. Except for military service, and a period from 1955 through 1963 when he lived in Florida, he has lived in the Youngstown-Warren area all his life. He pled guilty to two counts of income tax evasion on January 14, 1974.
 
 
 4
 Mary Selak, also a defendant in this lawsuit, is Samuel Ambrose's mother. Martha M. Ambrose is Samuel Ambrose's wife of over 30 years. Alma Silvis, Martha Ambrose's mother, died in September 1968, following her husband's death in 1954. Samuel and Martha Ambrose have two children, William, born on August 15, 1954, who during 1970 was involved in a serious auto accident, and later received a payment on his insurance claims. William was married for a brief period of time but was divorced in June 1976. The other child, Deborah Caisango, is married to Robert Caisango.
 
 THE WARD AVENUE PROPERTY
 
 5
 During the relevant years, there were six transactions involving the Ward Avenue property. The basic factual outline of these transactions sketched by the district court is not in dispute. We summarize these transactions:
 
 
 6
 1. During 1964, Samuel and Martha Ambrose purchased the property. At that time it consisted of four lots with a house built on one of the lots. The Ambroses purchased the property subject to an $18,500.00 mortgage held by Trumbull Savings & Loan Company. The Ward Avenue property served as a personal residence of Samuel and Martha Ambrose, their children, William and Deborah, and Mrs. Ambrose's mother, Alma Silvis.
 
 
 7
 2. On January 31, 1966, Samuel and Martha Ambrose conveyed the property to Alma Silvis by a quit claim deed. There was no consideration given in exchange for this conveyance. The Ambroses continued to live in the house along with Alma Silvis. Samuel Ambrose continued to pay the real estate taxes and the mortgage on the property.
 
 
 8
 3. Records indicate that on August 29, 1968, one month before her death, a formal conveyance of the Ward Avenue property from Alma Silvis to her granddaughter, Deborah Caisango, took place by a quit claim deed without consideration. At that time, Deborah was 18 years old and was living in the home on the property together with her husband and two year old child.
 
 
 9
 4. During February 1971, the property was replatted into three lots. The family home was on one lot and the other two lots were free of structures. During the late fall of 1972, the two unimproved lots were sold to Alfred W. Weavers and Robert T. Moosally. All of the negotiations surrounding this transaction were conducted by Samuel Ambrose himself.
 
 
 10
 5. On December 8, 1972, Deborah Caisango conveyed the remaining property to her brother William again without consideration. Following this transaction, Samuel Ambrose still continued to pay the real estate taxes and utilities expense on the property. Further, William Ambrose, the legal title holder for the property, paid rent to Samuel Ambrose while he and his parents lived in the house.
 
 
 11
 6. On February 13, 1979, William Ambrose conveyed the property to co-defendant Mary Selak, Samuel Ambrose's mother. There was no consideration for this conveyance and Mary Selak did not even know that the conveyance was taking place at that time. Following this transaction, Samuel and Martha Ambrose continued to live in the Ward Avenue house. Mary Selak did not collect any rent or pay any of the expenses or taxes on this property
 
 THE ESME DRIVE PROPERTY
 
 12
 On November 15, 1972, William Ambrose purchased the Esme Drive property, which was then a vacant lot, for approximately $4000.00. He was a minor at the time and paid for the property in cash.
 
 
 13
 During 1973, a house was built on the Esme Drive property at a cost of $30,000.00. William Ambrose took no part in the construction, and his father Samuel made the contacts and arrangements with the builders. Samuel Ambrose frequently signed William's name to documents involved in the construction and many of the payments made for the construction were made in cash by Samuel. Deborah Caisango, her husband, and their children have lived in the Esme Drive property from that time until the present.
 
 
 14
 On February 10, 1979, William Ambrose conveyed this Esme Drive property and improvements thereon to Mary Selak by a quit claim deed without consideration. Prior to the conveyance, Mary Selak had no knowledge that she was going to become the owner of the Esme Drive property.
 
 
 15
 The principal contention of Samuel and Martha Ambrose is that the bulk of these transactions were financed through funds held by and later inherited from, Alma Silvis. They contend that Alma Silvis kept nearly $70,000.00 in cash in a metal strongbox under her bed in the Ward Avenue home. They asserted that Silvis used this cash for loans to Samuel Ambrose in the early 1960s. Ambrose therefore purportedly made the 1966 conveyance of the Ward Avenue property to Silvis as security for these loans. After Alma Silvis' death, the remaining cash in the cashbox was allegedly divided between Deborah and William, each receiving about $30,000. William Ambrose paid for the Esme Road construction using this cash, handled by his father. The husband of Deborah Caisango allegedly gambled away her share of the 'inheritance.'
 
 
 16
 Mr. and Mrs. Ambrose also attempted to provide an explanation for the sources of mother-in-law Silvis' cashbox reserve. She allegedly inherited a net estate of less than $5,000 at her husband's death in 1954. The Ambrose defendants, however, presented testimony that Mrs. Silvis also received between $20,000 and $25,000 in cash from real estate sold by William Silvis, her husband, just before his death, along with $40,000 in insurance death proceeds. According to them, Alma Silvis later bought a home in Florida for $20,000 but received a gift of $45,000 in cash from an aunt, Alma Miller, in 1959. She allegedly kept $30,000 of the gift and gave $15,000 to daughter Martha. All of this money was purportedly cash and kept in the metal strongbox. None of these cash transactions is acknowledged in any probate records, nor supported by any written documentation.
 
 
 17
 The district court explicitly evaluated Samuel Ambrose's defense 'in the context of [his] . . . past record of business dealings and tax practices.' Ambrose had not filed federal income tax returns since 1972. He has pled guilty and served a jail term for conspiring to assist in and advise in the preparation and presentation a false and fraudulent federal income tax returns and the forging of signatures to government checks and tax returns.
 
 
 18
 Samuel Ambrose has also participated in a number of actions and schemes designed to frustrate, defeat, and defraud his creditors, including the United States by using various close relatives or their names in business transactions. Notably, Samuel Ambrose frequently conducted business in the name of his son, frequently signing his name as William Ambrose. Funds held in a Metropolitan Savings & Loan passbook savings account in the name of William Ambrose for the benefit of Samuel Ambrose were withdrawn on or about April 8, 1976, one hour ahead of the Internal Revenue Service's attempted levy on the account. Finally, Samuel Ambrose conducted the transactions involving his son's leasing company.
 
 
 19
 After hearing the proof in the case, the district judge found the defense offered by the Ambrose family to be 'incredible.' The court specifically found that
 
 
 20
 Alma Silvis did not receive these large cash payments and did not have nearly $70,000 in cash in her personal control at the time of her death. The court, therefore, rejects defendants' view of the various transactions involving the Ward Avenue and Esme Drive properties based upon the use of this cash. Samuel Ambrose's personal income provided the needed funds for these transactions.
 
 
 21
 The district court went on to make other factual findings about each formal conveyance of the Ward Avenue property. He found that Ambrose's January 1966 conveyance to mother-in-law Silvis 'lacked economic substance' because Silvis had never made a loan to Ambrose and because the bank already held a mortgage on the property.
 
 
 22
 The subsequent conveyance from Silvis to Ambrose's daughter Deborah Caisango in August 1968 he also found to be 'suspect.' The court emphasized that
 
 
 23
 At the time, Alma Silvis was disabled by a stroke and was unable to sign her name. The signature on the deed, however, does not reflect the signature of an infirm individual. In the absence of a reliable witness to the signing of the deed, the court believes that this conveyance did not take place.
 
 
 24
 The district court also flatly rejected Smuel Ambrose's tender of an unprobated will by Silvis that purportedly divided up the remaining cashbox money among Ambrose's two children. Judge Dowd characterized the will as a 'forgery' because the 'ink used to sign Alma Silvis' name was not produced till substantially after her death.'
 
 
 25
 Furthermore, the court characterized the 1972 conveyance from Ambrose's daughter Deborah Caisango to his son William as 'a meaningless transaction.'
 
 
 26
 Samuel Ambrose acted as the owner of the property both before and after this transaction. There is no credible evidence that proceeds from the sale went to anyone other than Samuel Ambrose. Before the transaction, Samuel Ambrose negotiated the sale of the two extra lots to Weavers and Moosally. After the sale, Samuel Ambrose continued to live in the house and collected rent from the legal title holder, William Ambrose.
 
 
 27
 Finally, the court found 'no evidence in the record' that Ambrose's co-defendant mother, Mary Selak, had 'acted as the equitable owner' of the Ward Avenue property after William's conveyance to her in 1978. The court in fact emphasized William's testimony that he conveyed formal title in part because of counsel's concern that the property in his name would be subject to 'the tax liens that Sam Ambrose had on him.' The court found this testimony to establish that the 1978 conveyance 'was admittedly undertaken to avoid the claims of Samuel Ambrose's creditors, particularly the United States Government.'
 
 
 28
 The court came to very similar conclusions about the Esme property. In the court's view Ambrose 'paid his own cash for the property' in 1972. The signatures of his son regarding the 1973 construction were also found to be 'forgeries' by Samuel Ambrose, because William did not have sufficient assets and Ambrose was deemed to have paid for the construction from his own funds. His son's 1978 conveyance to Ambrose's mother Mary Selak was admittedly done to attempt to insulate the property from Ambrose's creditors.
 
 
 29
 The issue whether a taxpayer has ownership interest in property is a question governed by state law. See Aguilino v. United States, 363 U.S. 509, 512-13 (1960).
 
 
 30
 Ohio's fraudulent conveyance statute O.R.C. Sec. 1336.09(a), provides as follows:
 
 
 31
 Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person . . .
 
 
 32
 (1) have the conveyance set aside . . . to the event necessary to satisfy his claim; or
 
 
 33
 (2) disregard the conveyance and attach or levy execution upon the property conveyed.
 
 
 34
 The statute defines fraudulent conveyances to include
 
 
 35
 Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors . . ..
 
 ESME STREET CONCLUSIONS
 
 36
 Judge Dowd briefly stated his conclusion that Ambrose had fraudulently conveyed the Esme Street property to others under the terms of the Ohio statute:
 
 
 37
 Samuel Ambrose has been the equitable owner of the Esme Drive property from the time of its purchase to the present. The other legal title holders to this parcel of property have been mere nominees of Samuel Ambrose. Samuel Ambrose changed the names on the deed to the Esme Drive property with actual intent to hinder, delay, obstruct and defraud the claims of the United States government.
 
 
 38
 We AFFIRM the district court with respect to the Esme Street property. The essential fact findings are not demonstrated to be erroneous, and his legal conclusions are a logical consequence of these findings so that the Esme Street property is subject to the tax claims of the United States.
 
 WARD AVENUE CONCLUSIONS
 
 39
 We find the trial court's factual findings with respect to Ward Avenue not to be erroneous. He stated that he did not believe the Ambrose testimony that Alma Silvis made loans to them as claimed. He noted that there was an outstanding bank mortgage on this property when it was conveyed to Silvis in 1966. He found the 1968 Silvis conveyance to her granddaughter to be 'suspect,' and, in fact, did not even take place; that the 1972 conveyance from Deborah to her brother, William, was a 'meaningless transaction,' because Samuel Ambrose continued to act as owner both before and after 1972, and received the sole proceeds from the property.
 
 
 40
 In addition to these findings of fact the law in Ohio presumes that the types of conveyance made of the Ward Avenue property was fraudulent as an effort to hinder and delay creditors.
 
 
 41
 '* * * a voluntary conveyance by an indebted parent to his child is presumptively fraudulent. It is said that a voluntary conveyance by a father in embarrassed circumstances, to an infant child is, on its face fraudulent against creditors.' 19 Ohio Jurisprudence 769.
 
 
 42
 Ursak v. Sivanick, 56 Ohio App. 434, 10 N.E.2d 1017-18 (1937). Defendants have made no persuasive showing that the presumption of fraud does not apply to the transactions with respect to Ward Avenue. It seems evident that after a transfer found to be made in 1966 to have 'lacked economic substance,' Samuel Ambrose and his wife were equitable owners exercising effectively all the requisites of ownership, merely lacking legal title which was placed in a close relative's name. Just before Alma Silvis' death several years later, a purported deed was made to an 18 year old minor, the child of Samuel and Martha, but the court found this transfer of legal title did not actually take place. (By the law of inheritance, Martha Ambrose stood to inherit the property upon her mother's death).
 
 
 43
 Under the factual circumstances in this case we find the district court's conclusions that fraud has not been demonstrated with respect to the Ward Avenue property to be in error. The Ambrose parents were equitable owners and occupied, used and possessed the property and the fruits thereof throughout the applicable period as constructive trustees will all the incidents of ownership but bare legal title.
 
 
 44
 Ohio courts have held that in appropriate situations equity will impose a constructive trust upon a property interest to require a proper accounting for proceeds and to avoid imposition of a fraud.
 
 
 45
 Express trusts may be engrafted upon absolute deeds, devises or deposits by parol evidence
 
 
 46
 * * *
 
 
 47
 * * *
 
 
 48
 constructive or resulting trusts which are creatures of equity designed to prevent unjust enrichment through fraud or mistake may be established by parol evidence.
 
 
 49
 Steiner v. Fecycz, 72 Ohio App. 18, 50 N.E.2d 617, 621 (1942), citing Ferguson v. Deuble, 27 O.L.A. 533.
 
 
 50
 The facts in this case literally cry out for application of principles of equity and imposition of a constructive trust in the Ward Avenue property. It is deemed by the operation of law to be the property of Samuel and Martha Ambrose subject to the claims of the United States as a creditor. See 89 C.J.S. Trusts, Sec. 15 (Constructive Trusts). We accordingly hold that the real owners of this property are Samuel and Martha Ambrose. We grant the relief sought by the United States in this appeal in order to satisfy these taxpayer's delinquent tax liability under Section 6321 of the Internal Revenue Code.
 
 
 51
 In summary, then, we AFFIRM the district court as to the Esme Drive property, and we REVERSE its conclusion as to the Ward Avenue property. The case is remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 A stipulation, filed February 1, 1983, admits the following judgment is outstanding against Samuel L. and his wife, Martha M. Ambrose:
 1970--$14,139.71
 1971--$30,252.74
 1972--$63,181.18
 There is also due from Samuel L. Ambrose as transferree of Better Records, Inc.:
 for 1971--$60,208.74
 for 1972--$93,977.58
 The Ambroses have also stipulated liability for statutory interest on these tax assessments.